## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

TODD W. BOYES,

      Plaintiff,

v.                                              Case No. 2:18-cv-01247

J. SIMMONS and STEVEN WEBB,

      Defendants.

### PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable Thomas E. Johnston, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Pending before the court is a Motion for Summary Judgment (ECF No. 169) filed by Steven Webb ("Webb") and Joshua Simmons ("Simmons") (hereinafter "Defendants").[1]  As more thoroughly addressed herein, it is respectfully **RECOMMENDED** that Defendants' Motion for Summary Judgment (ECF No. 169) be **GRANTED** with respect to Plaintiff's alleged Eighth and Fourteenth Amendment claims and **DENIED** with respect to his Fourth Amendment claims against Webb and Simmons, which should be set down for a jury trial.

---

[1] The presiding District Judge previously dismissed all claims against Robert Pickenpaugh (ECF No. 155) and, by agreed order, Plaintiff voluntarily dismissed all claims against Travis Hawley (ECF No. 198). Additionally, because Plaintiff removed them from the style of the Amended Complaint and failed to timely identify any other defendants, the Clerk is directed to terminate John Does 1-5 as parties on the docket sheet.

## I.    *FACTUAL BACKGROUND*[2]

On February 25, 2017, Todd W. Boyes (hereinafter "Plaintiff") drove a white Ford F-350 truck that he allegedly stole at gunpoint in Ohio into Charleston, West Virginia.[3] The Ohio State Police issued a "Be on the Lookout" ("BOLO") alert claiming that Plaintiff had carjacked the vehicle using an AR-15 rifle, that another firearm might be present in the vehicle, that he was armed and extremely dangerous, would resist arrest, and would engage in a shootout. (ECF No. 170 at 24, Ex, B; ECF No. 183 (Plaintiff's Deposition) at 14). A warrant was issued for Plaintiff's arrest for armed robbery and carjacking. (ECF No. 183 at 79). The BOLO and warrant information were disseminated to law enforcement in and around Kanawha County, West Virginia, including the Charleston Police Department ("CPD"), around 7:00 p.m. (*Id.*; ECF No. 170, Ex. C). Although it now appears that Plaintiff's father had previously been convicted of a murder in Ohio, in which Plaintiff denies any involvement, the responding officers were under the impression that Plaintiff may have also been involved in an "execution style" murder. (ECF No. 183 at 20-22).

Around 7:48 p.m. (1948 in military time which was used on some of the video footage in the record)[4], the stolen F-350 truck was spotted on Interstate 77 by CPD Officer D.J. Barnette. (ECF No. 169, Ex. D; ECF No. 172, Ex. F). Barnette called for backup and began to follow the vehicle down the interstate. (*Id.* beginning on his body camera footage

---

[2] The documents cited in this section will be more fully identified in section II, "Procedural History."

[3] During his deposition, Plaintiff asserted his Fifth Amendment privilege against self-incrimination and refused to answer questions related to how he obtained the truck because he had pending charges concerning the same in Ohio. (ECF No. 183 at 12-13).

[4] Due to the manner in which the various videos played on the court's video software, some of the citations to time stamps herein are in military time and some are based upon the time marks showing the length of the video itself.

at 1949).  Plaintiff later testified that he had never been to Charleston and was not familiar with the area.  (ECF No. 183 at 16-17).

Plaintiff exited the interstate at MacCorkle Avenue (Exit 95) and pulled into the International House of Pancakes ("IHOP"), where Officers Barnette and McClure initiated their lights and sirens and pulled in behind the truck.  (*Id.* at 17-18; ECF No. 172, Exs. F and G at approximately 1952).  At that point, Plaintiff sped out of the IHOP parking lot and returned to the interstate heading back towards Charleston.  (ECF No. 183 at 18-19; ECF No. 172, Exs. F and G).  As officers pursued him, Plaintiff fled at a high rate of speed, drove the wrong way down an interstate entrance ramp, passed cars illegally in the wrong lane of traffic, and refused to stop "because [he] didn't want to go to jail."  (ECF No. 183 at 19-20).  When asked if he hoped to get away and not get arrested, Plaintiff said "absolutely."  (*Id.* at 20).

As evident from the dash and body camera footage produced by Defendants, Plaintiff recklessly led officers on a chase to an off-road "trail-type" area in Sanderson, which has also been described as a "coal camp," approximately 20 miles northeast of Charleston.  (ECF No. 172, Exs. F, G, K, and L; ECF No. 180, Exs. 6, 11 and 12).  Plaintiff testified that he believed if he got off the paved road, officers would not be able to follow him.  (ECF No. 183 at 23-24).  As evident from the video footage, Plaintiff led officers from the main road across a small wooden bridge and out one of the trail roads to a creek. Plaintiff crossed the creek with Barnette still in pursuit, but McClure's vehicle stalled in the creek.  (ECF No. 170, Exs. D and E; ECF No. 172, Exs. F and G at approximately 2015).

Plaintiff subsequently turned around and drove back towards Barnette and again entered the creek, where the truck temporarily stalled for a couple of minutes.  (ECF No. 170, Exs. D and E; ECF No. 172, Exs. F and G at approximately 2021; ECF No. 183 at 24).

3

Meanwhile, other officers had driven in different directions and were located on other areas of the trails along Plaintiff's eventual path, both in vehicles and on foot.  (ECF No. 222 at 103-112, Ex. 27 (Knapp Supplemental Report) and at 118-120, Ex. 30 (Critical Incident Review)).  Many of the officers turned off their lights and sirens.  (ECF No. 183 at 25-26).  As evident from the video footage and post-incident reports, there was a lot of confusion concerning Plaintiff's whereabouts and the location of other officers in the area.

The dash and body camera footage of Barnette and McClure, as well as their incident reports, demonstrate that, while stuck in the creek, Plaintiff ignored multiple orders to get out of the truck and show his hands.  (ECF No. 170, Exs. D and E; ECF No. 172, Exs. F and G at approximately 2021-2023).  Once he was able to restart the truck, Plaintiff drove out of the creek.  As Plaintiff pulled out of the creek, Webb fired three shots through the side window of the truck and one of those shots struck Plaintiff's right hand.  (ECF No. 183 at 23).  In pertinent part, Webb's car camera footage, which has been provided as an exhibit by Plaintiff, shows Webb driving down a trail road towards the creek and stopping his vehicle with his headlights turned away from the creek.  On the video footage, Plaintiff's truck is seen slowly exiting the creek and heading down another trail that appears to run almost parallel to the road where Webb is located.  Within a few seconds, three shots are fired, off camera, before Webb returns to his vehicle and turns the vehicle around to exit the area to pursue the truck.  (ECF No. 180, Ex. 6 between 20:24:52 and 20:24:56).

Plaintiff acknowledged that, at the time Webb shot him, he did not know where other officers were located or if they were in or out of their cars, and he admits that he did not give up.  (ECF No. 183 at 34-35).  McClure's incident report states that there were two other cruisers on the far side of the creek.  (ECF No. 170 at 33, Ex. E).  Despite testifying

in his deposition that it was dark, and he did not know that Webb was positioned on the far side of the creek, and notwithstanding the video and documentary evidence demonstrating that he ignored the multiple orders of the other officers to surrender, Plaintiff's supplemental responses now assert that he was slowly pulling out of the creek in order to surrender to Webb.[5]

According to Webb's statement to investigators, when Plaintiff was in the creek, Webb first thought he was on foot.  (ECF No. 170-1 at 5-6, Ex. H).  Webb then saw the truck coming back through the creek.  He told the investigator, "I had a clear shot on his windshield and I felt like . . . the officers and the public were in imminent danger based on the volatility of the circumstances."  (*Id.* at 6).  "I fired three rounds at him trying to get him to stop and he just started screaming and cussing and he kept going . . . ."  (*Id.*)  "He continued back up the creek and he got back on the main road."  (*Id.* at 7).

Webb's affidavit confirms that "[t]here were numerous other officers in the general area."  Specifically, he stated, "there were other officers positioned in the direction in which Plaintiff was headed."  (ECF No. 170-1 at 44-45, Ex. M).  Webb also stated that, given the information they had been provided with the BOLO, and Plaintiff's reckless conduct during the chase, he considered Plaintiff to be an immediate threat to the other officers and the general public.  (*Id.*)

---

[5] Because this assertion totally contradicts his prior sworn deposition testimony and his conduct and statements on the video footage in the record, Plaintiff's contentions in his supplemental responses that he was exiting the creek in order to surrender to Webb may be considered the equivalent of a "sham affidavit" offered solely to attempt to create an issue of fact where there otherwise is none.  *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement"); *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

During his deposition, Webb was asked to explain his understanding of the events at the time of the incident. As noted in Defendants' Supplemental Reply, Webb testified as follows:

> I was provided information that not only had you killed someone, but that you had killed them execution style. Furthermore, I was aware, based on the BOLO, that you were armed and dangerous, and it states that you would involve yourself in a shootout with officers if attempted to be captured. Your actions backed up what we were provided in that BOLO by refusing to stop when Patrolman Barnette at the time, I believe he's a corporal now, attempted to stop you. Not only did you just refuse to stop, you went through parking lots where people were going to dinner at the IHOP. You got on the interstate . . . [w]ith speeds in almost excess of a hundred miles an hour where families are on interstate having to get out of your way or trying to get out of your way because you're fleeing from the police. And furthermore, you lock up your brakes up on the interstate and go the wrong direction on interstate down an on-ramp and you're swerving over in the opposite direction in oncoming traffic, and none of this is stopping you. All you have to do is pull over, but you are refusing to do this. In my mind, you will stop at nothing to get away.

> We had no opportunities to use stop sticks at that point. We were just trying to catch up to you to get you to pull over to get you to stop. Not even on the back roads of West Virginia out Sanderson would stop you. I mean that is a road maybe that ATVs can get up and down and you drove down through there, and we followed you because we had to get you to stop. We had to capture you for the public's safety. And even after you were stuck in the creek, somehow you were able to get the truck fired up and started back up, and I knew that you were headed in the direction of where officers that worked beside me were standing by and had no means of escape from you. Their vehicles were in the roadway, in that dirt roadway and they were definitely in danger of serious injury and/or death because of your actions, and I saw an open window to stop you from getting up to those officers.

> For me to have to get back into another pursuit with you, everyone on the radio kept saying, "He's heading back to the bridge." "He's heading back to the wooden bridge." They kept saying, "the wooden bridge, he's heading that way." I was stopping you from getting to that wooden bridge and back out to the public that you were talking about earlier, the people that were out with their families, going to restaurants or leaving restaurants. So, in my mind, I had no other option but to stop you, and in part that is what stopped you.

(ECF No. 225 at 8-9 and Ex. M[6] (Webb Depo. at 46-48); ECF No. 222 at 43, Ex. 21).

Despite having been shot, Plaintiff continued to drive back towards the wooden bridge and the main road.  He approached an area where Officer Travis Hawley ("Hawley") and Corporal Renee Smith ("Smith") were located.  Based upon unclear radio communications, Hawley and Smith believed that Plaintiff was on foot at that point.  (ECF No. 172, Ex. K at approximately 2026).  However, after they were advised that Plaintiff was still fleeing in the truck and rapidly approaching them, Smith attempted to move her cruiser out of the road.  Hawley, who was still on foot, spun around to get out of the way of the truck, and fired one shot that did not hit Plaintiff.  (ECF No. 170-1 at 15, Ex. I). Plaintiff then rammed Smith's cruiser and shoved it off the road, causing injury to Smith, and he continued to flee with numerous other officers allegedly located in the general area.  (*Id.*; ECF No. 170-1 at 15-16, Ex. I (Hawley Statement) and 47-48, Ex. H (Hawley Affidavit); and ECF No. 183 at 24-25).  During his deposition, Plaintiff admitted that he "failed to yield to their lawful authority."  (ECF No. 183 at 25).

Plaintiff then came over a hill at a fast rate of speed to where Simmons was parked along the edge of the road on a flat spot.  Simmons set up behind the hood of his cruiser with an AR-15 rifle.  According to his statement and affidavit, Simmons had previously heard gunshots and saw muzzle fire, but was unsure who was doing the shooting.  He further stated that he was aware that there were numerous other officers in the general area and believed that Plaintiff was on his way back towards them, headed back to the main road.  Simmons told investigators that Plaintiff was "coming at us on the road to the right when you come across the bridge."  (ECF No. 170-1 at 30, Ex. J (Simmons

---

[6] The undersigned notes that Defendants mistakenly re-used Exhibit Nos. M and N when they filed their supplemental reply (ECF No. 225).

Statement)).  He stated that, from his perspective, the truck was coming directly at him. He said the truck "comes over the hill at me . . . coming directly at my car." (*Id.*)  Simmons further stated that, given the information provided with the BOLO and Plaintiff's reckless conduct during the chase, he, too, considered Plaintiff to be a threat to the other officers and the general public.  (ECF No. 170-1, at 27-30, Ex. J (Simmons Statement) and at 50-51, Ex. O (Simmons Affidavit)).

Simmons told the investigator that, as the truck rapidly approached him, he shot his AR-15 rifle at the driver's seat through the front windshield of the truck and continued to fire as the truck passed him.  (ECF No. 180 at 56, Ex. 10).  Although Simmons also told the investigator that he thought he had fired 5 times, from the video footage, it appears that he may have fired as many as nine times; however, none of those shots actually struck Plaintiff.  Plaintiff continued to drive forward, but crashed into a ditch and hit a tree, ending his flight.  (ECF No. 172, Ex. L at 36:42-36:50 marks; ECF No. 180, Ex. 11 (same time marks) (Simmons body camera footage)).  As noted by Plaintiff, Simmons' statement to the investigator acknowledged that there were no other officers in his location at that time.  (ECF No. 180 at 56, Ex. 10 (p. 11); ECF No. 183 at 33).

During his deposition, Simmons described his understanding of the events as follows:

> Initially, we were given a BOLO, just after we came to work that night that there was a vehicle fleeing from Ohio in this direction; that the driver, Todd Boyes, yourself, had committed an execution style murder and carjacked two separate vehicles and was in a white F-350 that was attempting to make its way to Florida, and that you were considered armed and dangerous; that you would likely engage in a shootout to avoid capture, and it was just a BOLO.  We were looking for your vehicle.
>
> After, you know, the amount of time it would take basically for somebody to drive from where the BOLO was to Charleston, Patrolman Barnette observed your vehicle on the interstate.  He got behind your vehicle

8

and, after it was safe to do so, attempted to stop you in the IHOP parking lot. You immediately fled from him and, at that point, we began pursuing you. I became engaged in pursuit at the 36th Street Bride, after blocking traffic to try to keep anybody from getting on the interstate so they would be out of harm's way due to your driving in excess of 110 miles an hour.

After that, you of course, stopped in the middle of the interstate. You went - you came to a complete stop in the roadway where vehicles normally travel 70 miles an hour or more, went the wrong way down an entrance ramp towards oncoming traffic, crossed the median again, went towards oncoming traffic, go on Greenbrier Street, and then continue to flee towards the Sanderson area.

While fleeing towards the Sanderson area, you pulled into the opposite lane of traffic, most likely in an attempt to get those vehicles to pull into our lane of traffic to cause crashes, while you would swerve into their lane, swerve back over quickly. Again, you are traveling extremely fast for the roadway, much faster than the speed limit. Eventually you come to the wooden bridge and the Sanderson area where the pursuit was ultimately ended after you crashed. While in the Sanderson area, our radio traffic was spotty at times. I knew that you'd stalled out in the creek. At one point, you were supposed to be on foot. That's when I exited my vehicle the first time attempting to locate you.

After that, there was a shots fired while – that I could view the muzzle flashes out in the distance, but was unsure who fired the shots, knowing that you were considered armed and dangerous and that you supposedly had an AR-15 that was eventually recovered, that the shots could have come from you. Of course, eventually it was determined that Sergeant Webb, now Lieutenant Webb, fired those rounds.

After that you were able to get unstuck from the creek and flee back out towards the wooden bridge towards other officers and the general public. Once you were fleeing, you hit a cruiser, which at the time I did not know that you had struck the cruiser, but I heard a noise that could have been – that I thought was a crash, and I heard another gunshot.

Then where I was positioned at the base of a road, your vehicle came over the hill at a high rate of speed, basically straight in my direction, and then you turned and went around my vehicle. You know, as I picked you up and observed you, observed the vehicle coming at me at a high rate of speed, I shot my rifle at you repeatedly. As you approached and passed me, then you crashed shortly after that.

(ECF No. 225 at 9-10 and Ex. N (Simmons Depo. at 3-6); ECF No. 222 at 22-23, Ex. 20).

After wrecking the vehicle, Plaintiff was restrained and removed from the truck and no further force was used against him. (ECF No. 183 at 29). An AR-15 rifle was located in the back seat of the truck. (*Id.*) Approximately one hour later, emergency medical staff arrived, and Plaintiff was taken to the hospital. (*Id.*; ECF No. 172, Ex. L at approximately 1:37 time mark; ECF No. 180, Ex. 11 (same time mark)). Prior to the medics' arrival, Plaintiff can be heard on Simmons' body camera footage acknowledging that he was sorry and admitting that he fled from the police officers because he did not want to go to jail. He also stated that it was his own fault that he ran off the road. (ECF No. 172, Ex. L at 52:50 and 1:06:15-20; ECF No. 178, Ex. 11 (same time marks)).

Due to the injury to his hand, Plaintiff's right ring finger was amputated from above the second knuckle. (ECF No. 183 at 30). Plaintiff asserts that he has pain and numbness in his right ring and middle fingers, which results in grip issues and limited use of his right hand. (*Id.* at 30-32, 36). He has provided medical records describing his condition and the surgical procedures performed. (ECF No. 180, Ex. 18).

## II.    RELEVANT PROCEDURAL HISTORY

### A.    *Plaintiff's Amended Complaint and relevant proceedings leading up to the filing of the instant summary judgment motion.*

This matter is proceeding only on the claims against Defendants Webb and Simmons contained in Plaintiff's Amended Complaint (ECF No. 8). Plaintiff summarily alleges that "the defendants" violated his Fourth, Eighth, and Fourteenth Amendment rights without attributing particular facts concerning the conduct of the individual defendants to each alleged constitutional violation. (ECF No. 8 at 16, "Relief Requested" ¶ 2). However, based upon a liberal reading of the Amended Complaint, it is apparent that Plaintiff avers that Webb and Simmons violated his Fourth Amendment rights by

shooting at him "without warning" when he was allegedly "not immediately threatening to anyone." (*Id.* at 10-12).

The Amended Complaint also alleges that Defendants acted to "ensure no video of value was saved to ensure that only the official narrative survives the shooting." (*Id.* at 14, ¶ 24). This appears to be the only basis of Plaintiff's Fourteenth Amendment claim contained in the Amended Complaint. As will be addressed *infra*, Plaintiff's allegations in the Amended Complaint, as a matter of law, fail to give rise to violations of either the Eighth or Fourteenth Amendments. Additionally, Plaintiff twice attempted to amend his Amended Complaint to add new claims under the Fourth, Eighth and Fourteenth Amendments, state law claims of assault and battery, and alleged violations of 42 U.S.C. §§ 1985 and 1986, but all of those proposed amendments were disallowed as being untimely and/or futile. (ECF Nos. 164, 168, 184 at 2-5, 205, and 208 at 2-7).

When he answered the Amended Complaint, Defendant Webb also filed a Counterclaim (ECF No. 33), alleging that he suffered physical injury while apprehending Plaintiff. However, Webb later voluntarily dismissed his Counterclaim. (ECF Nos. 83 and 107). Nonetheless, Plaintiff continued to seek discovery and make immaterial arguments about the dismissed counterclaim.

        B.    *Defendants' summary judgment motion.*

Following a period for discovery, which ultimately included the exchange of written discovery as well as the depositions of Plaintiff, Webb, and Simmons, Defendants filed the instant Motion for Summary Judgment (ECF No. 169) and Memorandum of Law in support thereof (ECF No. 171). Defendants assert that Plaintiff has failed to demonstrate that their conduct in firing weapons at Plaintiff's fleeing vehicle was objectively unreasonable in violation of the Fourth Amendment and that they are entitled

to qualified immunity on his Fourth Amendment claims.  Defendants further assert that, as a matter of law, Plaintiff is unable to state plausible claims for relief under either the Eighth or Fourteenth Amendments.[7]

In support of their motion, Defendants offer the following exhibits: (A) Plaintiff's deposition transcript;[8] (B) February 25, 2017 Ohio State Police (OSP) Hub Intelligence Unit "Be on the Lookout (BOLO) Alert regarding Plaintiff; (C) February 25, 2017 Detail Call for Service Report re: BOLO at 1856; (D) Ptl. D.J. Barnette Incident Report; (E) Cpl. S. McClure Incident Report; (F) Barnette body camera video footage; (G) McClure body camera video footage; (H) Statement of Steven Webb; (I) Statement of Travis Hawley; (J) Statement of Joshua Simmons; (K) Hawley body camera video footage; (L) Simmons body camera video footage; (M) Affidavit of Steven Webb; (N) Affidavit of Travis Hawley; and (O) Affidavit of Joshua Simmons.  (ECF Nos. 170 and 172).

C.    *Roseboro* notice.

Pursuant to the holding of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Plaintiff was advised of his right and obligation to respond to Defendants' motion for summary judgment and of the evidence and materials upon which he could rely to rebut Defendants' evidence, as provided in Rule 56 of the Federal Rules of Civil Procedure and deadlines for responses and replies were set and subsequently extended.  (ECF Nos. 39 and 156).

---

[7] Defendants' memorandum of law also addresses Plaintiff's post-arrest escape from the South Central Regional Jail.  Because that incident occurred after the subject incidents and are not directly relevant to the claims before the court on summary judgment, the undersigned will not address those facts herein.
[8] Defendants initially provided only excerpts of Plaintiff's April 23, 2019 deposition transcript.  (ECF No. 170, Ex. A).  However, on December 21, 2020, pursuant to the undersigned's order, they filed a complete copy of the transcript.  (ECF No. 183).  When citing to Plaintiff's deposition transcript, the undersigned will cite to the CM/ECF pagination found at the top of each page found in ECF No. 183.

#### D.    *Plaintiff's initial response to the summary judgment motion.*

Plaintiff filed an initial response to the motion for summary judgment on October 21, 2020.  (ECF No. 178).  Because the initial copy of his response was largely illegible, he filed a better copy of the same brief on October 30, 2020.  (ECF No. 180).[9]  Plaintiff offers the following exhibits in support of his initial response: (1) WVIX alert; (2) Webb Statement; (3) Webb Report 3-2-17; (4) Webb Report 5-10-17; (5) Webb Counterclaim; (6) Webb car camera footage; (7) Video Narrative; (8) Harshbarger video footage; (9) Critical Incident Report; (10) Simmons Statement; (11) Simmons body camera video footage disc 1; (12) Simmons car video footage disc 2; (13) KBI Report; (14) KBI shell casing pictures; (15) KBI truck pictures; (16) Webb Affidavit; (17) Boyes Affidavit; and (18) Medical records.  (ECF No. 180 at 24-101).

Plaintiff's initial response addresses his excessive force claims as well as his rejected claims concerning a "due process conspiracy" and deliberate indifference to his medical needs concerning the gunshot wound to his hand.  With respect to the excessive force claims, despite the Amended Complaint's allegation that he was "about a mile from the creek traveling at an estimated speed of 35 mph" at the time Webb shot him (ECF No. 8 at 10, ¶ 14), Plaintiff now claims, based upon the video and documentary evidence of record, that he was driving approximately two miles an hour as he pulled out of the creek after restarting the truck, just before Webb shot at him three times from the right side of the vehicle, about 200 yards down the road.  (ECF No. 180 at 3).  He specifically relies on Webb's car camera footage. (ECF No. 180, Ex. 6 at 35:00).  He further contends that Officers Barnette and McClure, who were located behind him, had terminated their

---

[9]  Because the second copy of the brief is more legible, the undersigned will cite to ECF No. 180 when addressing this brief and its exhibits.

pursuit, and that Webb was not in the path of the truck and, therefore, none of them were in immediate or imminent danger. (ECF No. 180 at 3-4).

Plaintiff further contends that, despite Webb's assertions that he feared for the safety of other officers and the public, the facts of record demonstrate that other officers were several minutes away, and that Webb has acknowledged that there were no members of the public in the immediate, very rural area. Consequently, he asserts that it was unreasonable for Webb to shoot at him under those circumstances. (ECF No. 180 at 3-4, 9-11 and Exs. 2, 6, 9, 10, and 16). Relying largely on the allegations contained in the subsequently dismissed Counterclaim, Plaintiff also asserts that "Webb will do or say anything to avoid liability." (ECF No. 180 at 4).

Plaintiff further asserts that Simmons stated that he shot at Plaintiff because he feared for his life and further denied firing at Plaintiff after he passed him, which is belied by the camera footage and his statement to investigators. (ECF No. 180 at 5 and Exs. 10 and 11). Plaintiff also claims that, in his statement to investigators, Simmons acknowledged that there were no other officers in his immediate vicinity. (*Id.* at 15-16 and Ex. 10).[10] Thus, Plaintiff claims that Simmons' conduct in continuing to fire at him after he passed by Simmons and was allegedly not an immediate threat to Simmons or anyone else, was objectively unreasonable. He further contends that the conduct of both Defendants violated the clearly established law determined by the Fourth Circuit in *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005), which will be addressed in greater detail *infra*. (*Id.* at 10-11).

---

[10] Plaintiff's initial response further addresses his speculative allegations that Webb and Simmons tampered with evidence by removing shell casings to cover up the number of shots actually fired by Simmons, one of several proposed amended claims that were rejected by the court as being futile or untimely. Thus, the undersigned will not again address the merits of those claims herein.

    E.    *Extension of discovery deadline for Defendants' depositions and granting leave to file supplemental response and reply briefs.*

Plaintiff subsequently obtained an extension of the discovery deadline in order to depose both Defendants and was ultimately given a deadline of May 10, 2021 to file a supplemental response to Defendants' motion for summary judgment based upon any additional evidence gleaned from the depositions.  (ECF Nos. 191, 196, 197, and 211).[11]

On May 12, 2021, the Clerk's Office received and docketed Plaintiff's first of two supplemental responses (ECF No. 222), which contains a certificate of service dated May 6, 2021, and appears to have been mailed from the Mount Olive Correctional Complex ("MOCC") on May 10, 2021.  Then, on May 14, 2021, the Clerk's Office received and docketed a second supplemental response (ECF No. 224), which contains a cover letter and certificate of service dated May 10, 2021, and which appear to have been mailed from MOCC on May 12, 2021.  Defendants assert that both supplemental responses were untimely filed.  However, Plaintiff receives the benefit of the "prisoner mailbox rule" which deems a document filed by a prisoner to be filed at the time the prisoner delivers the document to prison officials for forwarding to the Clerk of Court.  *See Houston v. Lack*, 487 U.S. 266 (1988).  Based upon the prisoner mailbox rule, the undersigned is compelled to consider both of Plaintiff's supplemental responses, as it appears that both could have been placed into the hands of prison authorities by May 10, 2021.[12]

---

[11] As noted above, during this time, among other motions, Plaintiff filed another motion attempting to amend his amended complaint to add new claims under the Fourth, Eighth and Fourteenth Amendments, as well as under 42 U.S.C. §§ 1985 and 1986 and West Virginia state law, and he also filed a motion for sanctions, all of which were subsequently denied by the court.  (ECF Nos. 200-205, 208, 213).

[12] As further explained by Plaintiff in his cover letter accompanying the second supplemental response, the reason he filed two supplemental responses is that he feared that the version he had sent to the law library to be typed by a legal aide would not be received in time, so he filed his own hand-written supplemental response and then, when he received the version from the law library, he filed it as well and requested that they be considered one response.  (ECF No. 224, Attach. 2, "Cover Letter").

15

In addition to the 18 exhibits addressed in Plaintiff's initial response, Plaintiff adds the following exhibits with his supplemental responses: (19) Criminal history/"rumor;" (20) Simmons deposition transcript; (21) Webb deposition transcript; (22) CPD policy; (23) Webb training history report; (24) "OSP intel" (BOLO alert); (25) CPD use of force report; (26) Hawley statement; (27) M.P. Knapp report; (28) BOLO alert cancelation (after Plaintiff was apprehended); (29) Investigator Dotson interview with Renee Smith; (30) CPD critical incident review; and (31) Paralyzed Man Sues S.C. Police (newspaper article). (ECF No. 222 at 17-122).[13]

In his supplemental responses, Plaintiff continues to rely on the Fourth Circuit's decision in *Waterman* to assert that Defendants violated clearly established law when they fired weapons at him when neither they, nor anyone else in the immediate vicinity, were in imminent danger. Plaintiff also assert that Defendants violated their own CPD policies concerning the use of deadly force on a suspect in a moving vehicle and concerning the rendering of first aid to those in their custody who are injured at the time of arrest. Although he acknowledges that he was in a stolen vehicle and had been fleeing the police, he contends that the pursuit terminated when he was in the creek and that he was not "actively resisting;" that neither Webb nor Simmons saw a weapon in his hand at the time they fired at him; that neither Webb nor Simmons were in imminent danger at the time they fired at him; and there were no other officers or members of the public in their immediate vicinity. (ECF No. 222 at 3-5, 13-15; ECF No. 224 at 1-3, 5-7). He further

---

[13] The exhibits referred to in Plaintiff's second supplemental response (ECF No. 224) are inconsistent with those cited in his first supplemental response (ECF No. 222). Specifically, the second supplement lists Exhibit 25 as "drone surveillance footage" (which has not been provided to the court by Plaintiff or Defendants) while Exhibit 25 in the first supplemental response is a "CPD use of force report." The second supplemental response's exhibit list also ends at Exhibit 25 (whereas the first supplement references 31 exhibits).

suggests that Simmons' last four shots caused him to run off the road and crash into a tree, resulting in his arrest.  (ECF No. 222 at 11-12; ECF No. 224 at 12).

Plaintiff's second supplemental response also asserts, for the first time, that he was driving at a slow rate of speed out of the creek, in a "non-threatening manner in order to surrender to Webb."  (ECF No. 224 at 2).  He further states:

> Traveling at such a slow speed, it should have been apparent that Plaintiff was not attempting to use the vehicle as a weapon, and was merely trying to exit the high water and surrender.  When questioned, Officer Webb stated that he could clearly see that Plaintiff was the sole occupant in the vehicle when Webb discharged his weapon into the vehicle.  Further, when questioned about whether Plaintiff had any weapons in hand or anywhere, Webb responded, "no sir."

(*Id.*)  Plaintiff further emphasizes that, during his deposition, Webb agreed with him that the rural Sanderson "coal camp" was not an area where many, if any, members of the public would be found, and that the nearest officers were "at least 2 miles away."  (*Id.* at 2-3).  Thus, Plaintiff asserts that he posed no immediate threat to anyone.  (*Id.* at 3).  Plaintiff also emphasizes that Webb made no effort to use alternative measures to stop his flight and made the deliberate decision to fire at him, stating, "I saw an opportunity to stop your actions and I took that opportunity, and in part it worked."  (*Id.* at 4, citing ECF No. 222, Ex. 21 at 14).

As to Defendant Simmons, Plaintiff now asserts that "although [Simmons] did not make contact with Plaintiff directly, the shots fired into the vehicle caused Plaintiff to wreck.  As a direct result of the wreck, Plaintiff will be disabled to some degree for the rest of his life."  (ECF No. 224 at 12).  However, he fails to offer any evidence demonstrating any additional injuries he suffered from wrecking the truck.  Plaintiff further disputes much of the information that was contained in the BOLO, and the "rumor" that he had been involved in an execution style murder.  Nonetheless, the objective reasonableness

standard is based upon what the defendants reasonably believed at the time, even if, with the benefit of 20/20 hindsight, some of that information later proves to be incorrect.

In sum, Plaintiff's responses contend that there is a genuine dispute concerning facts to support a reasonable belief that Plaintiff was an immediate threat to Defendants or anyone else and, taking the evidence in his favor, a jury could find that Defendants used excessive force when they shot at him. Therefore, he asserts that summary judgment should be denied and that a jury trial should be held in this matter.

On May 17, 2021, Defendants filed a supplemental reply brief. (ECF No. 225). Their supplemental reply asserts that the facts, as demonstrated by Plaintiff's own testimony and the video evidence, are not in dispute. They further assert that, "[b]y Plaintiff's own account, he would stop at nothing to avoid going back to jail." (ECF No. 225 at 1-2). They further assert that Webb and Simmons took lawful and constitutional measures to put an end to Plaintiff's flight from justice and in response to their fear for the safety of other officers and the public. (*Id.*) Defendants' supplemental reply further asserts:

> Plaintiff cannot legitimately argue that the pursuit was over [when he stalled in the creek.] By his own account, he restarted the truck and drove the truck out of the creek away from the officers giving him commands to surrender. [Citation omitted]. Plaintiff alleges his hands were in the air as he exited the creek effectively showing he had given up. Whether his hands were in the air or not is irrelevant. He was operating the stolen truck while fleeing from officers who clearly instructed him to surrender by exiting the vehicle. Plaintiff chose to continue his reckless flight from justice.
>
> Plaintiff also brazenly alleges for the first time in his Supplemental Response in Opposition that he was exiting the creek to surrender to Defendant Webb. Plaintiff never mentioned his alleged intent to surrender during his deposition because Plaintiff had no intent to surrender. . . . Contrary to this assertion, Plaintiff exited the creek away from officers giving him commands and proceeded towards Defendant Webb. [Cites]. It is unlikely Plaintiff even knew Defendant Webb was even on the other side

of the creek.  According to Plaintiff's own allegations, Defendant Webb was hidden, off the road, without any lights or sirens illuminated.  [Citations omitted].  Rather, by his own account, Plaintiff stated that he would stop at nothing to avoid going to jail.  This alleged issue of material fact is not in dispute.

(*Id.* at 3-4).  Thus, Defendants assert that Plaintiff cannot plausibly contend that he was "not resisting" and planning to surrender to Webb and that such contention is completely unsupported by the evidence of record.  (*Id.* at 4-5).

Defendants further assert that Plaintiff's reliance on their alleged violation of CPD policies or state law is not sufficient to create a genuine issue of material fact to demonstrate a federal constitutional violation.  They further contend that Plaintiff's concession that former defendant Hawley's conduct was not unconstitutional should also result in a finding that Webb and Simmons did not violate the constitution because they were all presented with the same facts and circumstances.  (*Id.* at 6-7).  They maintain that Plaintiff had evaded law enforcement for more than 30 minutes, leading them on a dangerous, high-speed chase and that he was "clearly a threat to anyone who stood in his way."  (*Id.* at 7-8).  Defendants' supplemental reply further quotes from their depositions describing their knowledge and beliefs at the time of the incident, arguing that the "menacing facts and circumstances presented to [former] Defendant Hawley [who was dismissed] were identical to the facts and circumstances presented to Defendants Webb and Simmons . . ."  (*Id.* at 10).  Accordingly, Webb and Simmons contend that there are no genuine issues of material fact and they are entitled to judgment as a matter of law on Plaintiff's Fourth Amendment claims.

As noted previously herein, notwithstanding the denial of his motions to amend, Plaintiff's supplemental responses continue to make assertions and arguments based upon his rejected claims for relief as well as Defendant Webb's previously dismissed

counterclaim.  Consequently, the parties' briefs further focus on facts and issues that are simply irrelevant to the remaining claims.[14]

### III.    STANDARD OF REVIEW

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010).  Material facts are those necessary to establish the elements of a party's cause of action.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim.  *Celotex,* 477 U.S. at 322-23.  The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's claim.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Once the moving party demonstrates such a lack of evidence, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial.  *Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).  "A party opposing summary judgment must do

---

[14] As Plaintiff has been repeatedly advised, the Eighth Amendment is inapplicable to his claims because he was not a convicted prisoner at the time of these events and, thus, his proposed amendment to allege an Eighth Amendment claim of deliberate indifference to his medical needs was rejected.  Plaintiff's briefs also incorrectly focus on an alleged Fourteenth Amendment conspiracy claim, grounded in evidence tampering, which was also disallowed when the court denied his multiple motions to amend the Amended Complaint.  Plaintiff was then advised that any such conspiracy claim was futile under the present circumstances of the case because he could not presently demonstrate any actual injury or denial of access to the courts stemming from his speculative allegations that Defendants tampered with evidence.  Because these claims are not part of the Amended Complaint on which this matter is proceeding, the undersigned will not further address these allegations and arguments.

more than just rest upon mere allegations, general denials, or vague statements." *Brown v. Showboat Atlantic City Propoco, LLC*, No. 08-5145, 2010 WL 5237855, *2 (D.N.J. Dec. 16, 2010) (citing *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Rather, "the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Id.* (citing *Anderson*, 477 U.S. at 256-57). Accordingly, summary judgment will generally be granted unless a reasonable jury could render a verdict for the non-moving party on the evidence presented. *Anderson,* 477 U.S. at 247-48.

A court must not resolve disputed facts or weigh the evidence and may not make determinations of credibility. *Russell v. Microdyne Corp., 65 F .3d* 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Sprenkle v. Hartford Life Ins. Co.,* 84 F. Supp.2d 751 (N.D.W. Va. 2000).

## IV.    DISCUSSION

A.    *There are genuine issues of material fact concerning the reasonableness of Defendants' conduct prohibiting summary judgment on Plaintiff's Fourth Amendment claims.*

1.    Qualified immunity standards.

Defendants assert that they are entitled to qualified immunity on Plaintiff's claims against them.  Qualified immunity shields police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  As further noted by Defendants, the qualified immunity doctrine affords officers "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law'" and it "insulates them from 'bad guesses in gray areas.'"  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *Marciello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).  (ECF No. 171 at 9).

A clearly established right should not be defined broadly or "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), and is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).  The Supreme Court has confirmed that "a case directly on point [is not required], but existing precedent must have placed the statutory or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741.  Therefore, when confronted with a claim of qualified immunity, a court must ask the following question: "Taken in the light most favorable to the party asserting the injury, do the [specific] facts alleged show the officer's conduct violated a [clearly-established] constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "Such specificity is

especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (*quoting Katz*, 533 U.S. at 201).

> 2.    Fourth Amendment objective reasonableness standard.

Plaintiff claims that both Webb and Simmons used excessive force against him when they fired their weapons at the moving truck in the rural Sanderson coal camp area, after he fled from law enforcement and led them on a high-speed chase to Sanderson. As noted, Plaintiff's claims against Defendants are governed by the Fourth Amendment, which is wholly focused on the objective reasonableness of searches and seizures, including seizures accomplished by use of deadly force, such as discharging firearms. *Est. of Rodgers ex rel. Rodgers v. Smith*, 188 F. App'x 175, 180 (4th Cir. 2006) (citing *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003)).[15]

The Supreme Court has recognized that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Nonetheless, "[b]ecause deadly force is extraordinarily intrusive, it takes a lot for it to be reasonable." *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019), *citing Tennessee v. Garner*, 471 U.S. 1, 9 (1985) ("The intrusiveness of a seizure by means of

---

[15] Plaintiff's arguments concerning his excessive force claims against Webb and Simmons erroneously focus on the subjective intent element applicable to Eighth Amendment claims, rather than the objective reasonableness standard that is solely applicable to the Fourth Amendment claims at issue here. The Fourth Amendment solely governs Plaintiff's claims because the alleged force used against him occurred in the process of his arrest. He does not assert that any further force was used against him after he was taken into custody.

deadly force is unmatched.").

The test for whether the force employed to accomplish a seizure is excessive is one of "objective reasonableness under the circumstances[,]" requiring "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 399 (1989). The focus is on the reasonableness of the conduct <u>at the moment force is used</u>, recognizing that officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. *Id.* at 396 (emphasis added). Such consideration must be made "'in full context, with an eye toward the proportionality of the force in light of all the circumstances.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)). Thus, the focus "is on <u>what the police officer reasonably perceived at the time that he acted and whether a reasonable officer armed with the same information, would have had the same perception</u> <u>and have acted in like fashion</u>." *Lee v. City of Richmond*, 100 F. Supp.3d 528, 541 (E.D. Va. 2015) (citing *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994)) (emphasis added).

       3.    What constitutes a seizure?

However, before the objective reasonableness inquiry is even undertaken, Plaintiff must first establish that a seizure occurred. Here, there is no doubt that Webb's firing and striking Plaintiff's finger with a bullet constitutes a seizure for Fourth Amendment purposes, even though Plaintiff continued to flee. *See Torres v. Madrid*, 141 S. Ct. 989 (2021) (For Fourth Amendment purposes, seizure occurred at time bullet struck fleeing suspect, despite suspect not being subdued or submitting to authorities until a later time);

*see also Garner*, 471 U.S. at 7.   However, as found by the Court in *Rodgers*, *supra*, firing a weapon at a suspect who is not struck by the bullets does not constitute a seizure under the Fourth Amendment.  *Rodgers*, 325 F. App'x at 180-81.  Relying on earlier Supreme Court and Fourth Circuit precedent, the *Rodgers* Court found that:

> [A] seizure occurs only when there is a physical touching or a submission to a show of authority.  [Footnote omitted] *See id.* at 625-26, 111 S. Ct. 1547; *United States v. Letsinger*, 93 F.3d 140, 143 (4th Cir. 1996). Here, there was no seizure because the bullets from Deputy Farrow's weapon never touched Rodgers. *See Carr v. Tatangelo*, 338 F.3d 1259, 1267, 1270-71 (11th Cir. 2003) (noting that excessive force claim asserted by individual who was shot at by law enforcement officers, but not touched by bullets, did not involve Fourth Amendment seizure).

*Id.*

Based on this precedent, Defendants assert that, just as Plaintiff acknowledged by dismissing Hawley (whose shot did not hit Plaintiff) as a defendant herein, Simmons' conduct similarly did not violate a clearly established Fourth Amendment right because his shots (regardless of how many were fired or when they were fired) did not strike Plaintiff and, thus, did not constitute a seizure.  (ECF No. 179 at 5-6).  They contend that a seizure requires both "a show of authority" from law enforcement officers and "submission to the assertion of authority" by the suspect.  *See California v. Hodari D.*, 499 U.S. 621, 624 (1991).  (*Id.* at 5).  Thus, Defendants further contend that:

> [W]hen a fleeing suspect fails to submit to [] law enforcement's show of authority in attempting to effectuate a seizure upon the suspect, no seizure has occurred.  Nor does the situation change when the show of force at issue involves law enforcement having fired upon, but missed, a fleeing suspect. In fact, the Fourth Circuit addressed the exact question . . . in [*Rodgers*] in which the court explicitly held that "there was no seizure because the bullets from [the law enforcement officer's] weapon never touched [the fleeing suspect].

(*Id.*)  Because Simmons' shots did not strike Plaintiff, the undersigned initially agrees that, pursuant to the holding in *Rodgers*, Simmons' actions would not constitute a seizure

under the Fourth Amendment.

In his supplemental responses, however, Plaintiff appears to be attempting to distinguish his case from *Rodgers* by asserting that the shots fired by Simmons caused him to wreck the truck, putting an end to his flight from justice and resulting in his arrest. The Supreme Court has recognized that law enforcement action such that "a police-erected blockade" causing a crash that put an end to a suspect's flight or "ramming a car off the road" could be considered a "show of authority" and "submission" thereto, so long as there is "an intent to restrain" and a "termination of freedom of movement." *See Torres*, 141 S. Ct. at 1001 (*citing Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) and *Scott v. Harris*, 550 U.S. 372, 385 (2007)). Simmons' conduct could be viewed as a "show of authority" with "an intent to restrain" that resulted in the "termination of freedom of movement" of Plaintiff. Thus, out of an abundance of caution, and taking the evidence in the light most favorable to Plaintiff as the court must for purposes of the motion for summary judgment, the undersigned will nonetheless address the reasonableness of Simmons' conduct under the Fourth Amendment as though it constituted a seizure.

4.      Did Defendants violate a clearly established right?

Both Defendants assert that their conduct was objectively reasonable under the circumstances of this case and that they are entitled to qualified immunity. Their memorandum states:

> Specific to this case, the use of deadly force related to a police pursuit is not sufficient to defeat qualified immunity. As noted by the United States Supreme Court, "[this Court has] never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity. [*Mullenix v. Luna*, 136 S. Ct. 305 (2015)]. Similarly, the Fourth Circuit's most recent decision involving the police shooting of a motorist held that the police officer was

entitled to qualified immunity when he shot a suspect in the back as the suspect attempted to flee from the officer in a truck. [*Brown v. Elliot*, 876 F.3d 637 (4th Cir. 2017)].

Here, Plaintiff's flight from justice was undoubtedly, objectively dangerous. Plaintiff concedes that he drove the wrong direction into oncoming traffic, onto an on ramp, and passed several vehicles illegally while fleeing from numerous officers. [*See* Pl. Dep. at 19-20; Officer Barnette's Narrative Report; and Officer McClure's Narrative Report]. He traveled at speeds in excess of ninety miles per hour endangering the pursuing officers and the public. [*Id.*] And he eventually rammed a police cruiser with the stolen truck at 35 miles per hour, seriously injuring the female officer inside the vehicle. [*Id.* at 25; Officer Hawley's statement at 3; Officer Hawley's body camera footage at 2026 hours]. Plaintiff managed to evade officers for roughly forty-five minutes. [Pl. Dep. at 29]. He accomplished each of the foregoing while intoxicated on methamphetamines and marijuana. [*Id.* at 30].

(ECF No. 171 at 11).

Defendants further emphasize that Plaintiff was reportedly "armed and dangerous," with an AR-15 rifle in the truck, and that he was determined not to go to jail and was headed back towards the main road, while there were numerous officers in the area, and, if he continued to flee, could be a danger to members of the public. (*Id.* at 11-12). Thus, they assert that the use of deadly force was reasonable and necessary under the totality of the circumstances, and to "second-guess these defendants' actions and deny them qualified immunity would go against the Supreme Court's holding in *Mullenix* and would eliminate a police officer's ability to use deadly force in a dangerous police pursuit." (*Id.* at 12).

Moreover, Defendants contend that, even if the court were to determine that Plaintiff's actions were not "imminently dangerous to the public or the pursuing officers," they nevertheless reasonably believed that he was a continued danger, and that qualified immunity is granted based upon what a reasonable officer could have believed at the time in question. Thus, they assert that they are entitled to qualified immunity for their

actions.  (*Id.* at 13).

Plaintiff, on the other hand, asserts that Defendants' conduct was not objectively reasonable because, at the time both Defendants discharged their weapons, Plaintiff was not an <u>imminent/immediate</u> threat to any particular officers, and no members of the public were reasonably in danger given the rural location of the pursuit.  Additionally, Plaintiff asserts that both Defendants violated the Fourth Circuit's clearly established precedent in *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005), because they fired or continued to fire at Plaintiff's truck when they, and others, were not in imminent danger of harm by Plaintiff.

In *Waterman*, the Fourth Circuit held that, in the aftermath of a high-speed chase (during which the driver had reportedly tried to run an officer off the road), shots fired by officers at a moving vehicle after it had passed by them was an unreasonable use of force that violated the Fourth Amendment because the officers were no longer in imminent danger.  Thus, the Court found that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." 393 F.3d at 481.  Plaintiff relies on this statement of law to assert that, at the time Webb shot him, Webb, himself, was not in imminent danger and other officers were not in the immediate vicinity (based upon Defendants' statements to investigators, their own deposition testimony, and video evidence indicating that other officers were "over two minutes away.")  He further claims that Barnette and McClure, who were behind him at that time, had "terminated pursuit."  (ECF No. 180 at 3-4).  Thus, he claims that the chase had ended, and he was "not resisting" when Webb shot him.  (ECF No. 222 at 15).

Likewise, Plaintiff contends that Simmons was not in imminent danger and that he has acknowledged that there were no other officers in his immediate vicinity.  Plaintiff

further asserts that, once the truck passed him without incident, the additional shots Simmons fired were unreasonable under the Fourth Amendment based upon *Waterman*. He further suggests that Simmons' continued firing caused him to run off the road and strike a tree, resulting in him being taken into custody (*i.e.*, seized). (ECF Nos. 222 at 11-12; ECF No. 224 at 12).

Defendants' supplemental reply contends that the facts with respect to the Fourth Amendment claims, as supported by Plaintiff's own testimony and the video footage, are not in dispute. Their supplemental reply further states:

> By Plaintiff's own account, he would stop at nothing to avoid going back to jail. Defendants Simmons and Webb took lawful and constitutional measures to end Plaintiff's flight from justice. They feared for the safety of other officers and the public. As such, their use of lethal force was justified. Any injuries sustained by Plaintiff were the result of his own reckless conduct. Thus, this Court should grant Defendants' Motion for Summary Judgment and dismiss Plaintiff's meritless suit.

(ECF No. 225 at 1). Defendants further assert that Plaintiff has not disputed their characterization of the applicable law but, rather, merely attempts to assert three "factual" issues; those being: (1) that the pursuit was terminated when he was stuck in the creek; (2) that he was not "actively resisting" when he exited the creek and approached Webb; and (3) that Webb and Simmons acted "maliciously and sadistically" in order to "punish" him. Because the Fourth Amendment standard is one of objective reasonableness, the subjective intent of the officers is not relevant here. Thus, Plaintiff's contention that Defendants acted maliciously and sadistically is of no moment. *See Henry v. Purnell*, 652 F.3d 524, 535 (4th Cir. 2011) (en banc) ("our Court has consistently conducted an objective analysis of qualified immunity claims and stressed that an officer's subjective

intent or beliefs play no role.").[16]

It is undisputed that Plaintiff had led officers on a reckless and often high-speed chase for nearly 45 minutes from Charleston to Sanderson, during which he placed himself, the officers, and the general public in imminent danger. Plaintiff admitted that he had no intention to yield to the authority of the officers because "he didn't want to go to jail." Additionally, both Defendants were aware that there were other officers in the general area and, although the area was rural, they testified that they were concerned that Plaintiff would continue to flee back towards the main road where members of the public could be harmed.

The reasonableness of Defendants' conduct is not to be judged with 20/20 hindsight and deference must be granted to the fact that the officers made split-second judgments under rapidly evolving circumstances as Plaintiff attempted to evade arrest by flight. "Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection." *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996).

Nonetheless, since *Waterman*, the Fourth Circuit has clearly established that it is unreasonable for an officer to use deadly force at a moment when there is no immediate threat to himself or others. *See Williams v. Strickland*, 917 F.3d 763 (2019) ("Following *Waterman*, we have no difficulty concluding that if Strickland and Heroux started or

---

[16] Plaintiff also asserts that, under West Virginia law, Defendants are not entitled to qualified immunity if they acted maliciously or sadistically, citing *Hutchison v. City of Huntington*, 479 S.E.2d 649, 659 (W. Va. 1996). However, because Plaintiff's claims are brought under federal law, pursuant to § 1983, state law qualified immunity precedent is not applicable here and Plaintiff's contention is misplaced.

continued to fire on Williams after they were no longer in the trajectory of Williams's car, they violated Williams's Fourth Amendment right to freedom from excessive force."); *Krein v. Price*, 596 F. App'x 184 (Dec. 19, 2014) (affirming denial of summary judgment to officer who was no longer in danger of being hit by moving vehicle based upon clearly established authority in *Waterman*); *Gallmon v. Cooper*, 801 F. App'x 112, 115-16 (4th Cir. 2020) (finding genuine issue of fact as to whether the threat to officer's safety had passed at the time, which was material to the question of qualified immunity in light of *Waterman*).[17]

Defendants, instead, rely upon *Brown v. Elliott*, 876 F.3d 637 (2017), in which the Fourth Circuit upheld a grant of qualified immunity to an officer who fired into the passenger window of a moving vehicle.  However, in *Brown*, the officer (Elliott) was "leaning into the window of a moving truck" when he discharged his weapon, "not standing off to the side as the truck passed him without veering in his direction."  *Id.* at 644.  Therefore, the court found that those circumstances were "clearly distinguishable" from those in *Waterman* and *Krein* and that Elliott was entitled to qualified immunity. *Id.* at 643-44.  Here, the facts concerning the alleged threat Plaintiff posed to Webb, Simmons, or anyone else, are much closer to *Waterman* and *Krein* than *Brown*. Moreover, the facts concerning whether Plaintiff posed an <u>immediate</u> threat to any of these individuals are in dispute.  Taking those facts in the light most favorable to Plaintiff,

---

[17] Although *Williams and Gallmon* were decided after this incident involving Plaintiff, the court plainly articulates that the principle applied has been clearly established since *Waterman* was decided in 2005. 917 F.3d at 770 ("[T]he instant case requires no subtle line-drawing: The right that the officers allegedly violated falls well within the ambit of clearly established law. When we decided *Waterman*, in 2005, we clearly established that . . . officers violate the Fourth Amendment if they employ deadly force against the driver once they are no longer in the car's trajectory.")

a jury could find that the conduct of both Webb and Simmons was objectively unreasonable under the clearly established law at the time in question.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there are genuine issues of material fact as to whether Plaintiff posed an immediate threat to Defendants or others at the moment that they discharged their firearms into his moving vehicle and, thus, Defendants are not entitled to qualified immunity and judgment as a matter of law on Plaintiff's Fourth Amendment claims.

> B.    *The Amended Complaint fails to state any actionable claims under the Eighth or Fourteenth Amendments.*

Because the Amended Complaint also summarily alleged violations of Plaintiff's Eighth and Fourteenth Amendment rights, Defendants have addressed those claims in their motion for summary judgment as well, asserting that they fail as a matter of law. Turning first to his Eighth Amendment claims, Defendants note that the Eighth Amendment is only applicable after there has been "a formal adjudication of guilt." *Ingraham v. Wright*, 430 U.S. 651, 664 (1977); *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992). (ECF No. 171 at 14-15).

As Plaintiff has been repeatedly advised, because he was not a convicted prisoner at the time of these events, he cannot demonstrate a violation of his Eighth Amendment rights, stemming either from the force used against him, or the alleged failure to promptly provide him with medical treatment for his injuries (the latter claim having not been pled in the Amended Complaint and having been rejected when the court denied Plaintiff's prior motions to amend). He nonetheless persists in making such arguments in his briefs.

Based upon the clearly established precedent above, the undersigned proposes that the presiding District Judge **FIND** that, because Plaintiff was merely a suspect and

arrestee at the time of these incidents, and not a convicted prisoner, the Eighth Amendment has no application here. Therefore, as a matter of law, Plaintiff cannot demonstrate a violation of his Eighth Amendment rights.

Similarly, Plaintiff's allegations fail to establish a violation of his Fourteenth Amendment rights. Plaintiff, again, summarily asserts that Defendants' conduct violated his Fourteenth Amendment rights and "due process." (ECF No. 8 at 16, "Relief Requested" ¶ 2). To the extent that Plaintiff may be attempting to raise a Fourteenth Amendment due process claim arising out of Defendants' shooting at him, as aptly noted by Defendants, because he raised claims under the more specific protection guaranteed by the Fourth Amendment, he cannot also assert a substantive due process claim on the same factual basis. As previously acknowledged by the presiding District Judge herein, the Supreme Court has held that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (*citing Graham v. Connor*, 490 U.S. 386, 394-95 (1989)); *see also Vathekan v. Prince George's Cty.*, 154 F.3d 173, 177 (4th Cir. 1998) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." (citation and internal quotation marks omitted)); *Spry v. State of W. Va.*, No. 2:16-cv-01785, 2017 WL 440733, *6 (Feb. 1, 2017) (Johnston, J.) ("Under *Graham*'s guidance, the Court may not entertain a due process claim where Plaintiffs allege a Fourth Amendment claim arising from the same abusive government conduct.")

Furthermore, to the extent that Plaintiff may be attempting to assert a Fourteenth Amendment due process claim grounded in the alleged failure to preserve video evidence from these events (as alleged in his Amended Complaint, ECF No. 8 at 14, ¶ 24), he has failed to demonstrate what any allegedly missing evidence would have shown or any actual injury that he has suffered as a result. Moreover, even liberally construed, at best, Plaintiff's allegations, if proven, might support a finding of spoliation of evidence, not a constitutional violation.

As explained when the court denied Plaintiff's prior motion for sanctions, spoliation of evidence is generally a discovery issue or a matter of state law and refers to "the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (*citing West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)) (emphasis added). The duty to preserve evidence arises "not only during litigation but extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591 (*citing Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). "While the spoliation of evidence may give rise to court imposed sanctions . . . , the acts of spoliation do not themselves give rise in civil cases to substantive claims or defenses." *Id.* at 590. Thus, the undersigned is unaware of any precedent recognizing a plausible due process claim under § 1983 grounded in spoliation of evidence.

Plaintiff has failed to rebut Defendants' arguments asserting that his allegations do not state valid claims under either the Eighth or Fourteenth Amendments and there are no genuine issue of material fact concerning those claims. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Defendants are entitled to

judgment as a matter of law on Plaintiff's Eighth and Fourteenth Amendment claims.

## V.    RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that Defendants' Motion for Summary Judgment (ECF No. 169) be **GRANTED** with respect to Plaintiff's alleged Eighth and Fourteenth Amendment claims and **DENIED** with respect to his Fourth Amendment claims against Webb and Simmons, which should be set down for a jury trial.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, Chief United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to the opposing parties and Chief Judge Johnston.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Plaintiff and to transmit a copy to counsel of record.


August 19, 2021

Dwane L. Tinsley
United States Magistrate Judge

36