**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

TODD W. BOYES,

      Plaintiff,

v.           CIVIL ACTION NO.   2:18-cv-01247

ROBERT PICKENPAUGH,
   Sheriff, Noble County, Ohio et al.,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the Proposed Findings of Fact and Recommendation ("PF&R") submitted by United States Magistrate Judge Dwane Tinsley in this matter on August 19, 2021. (ECF No. 230.)   Additionally pending before the Court are Defendants Steven Webb ("Webb") and Joshua Simmons's ("Simmons") (collectively, "Defendants") Motion for Summary Judgment, (ECF No. 169); Defendants' Objections to the PF&R, (ECF No. 232); and Plaintiff Todd Boyes's ("Plaintiff") Objections to the PF&R, (ECF No. 239).   For the reasons more fully explained herein, the Court **ADOPTS** the PF&R to the extent it recommends dismissal of Plaintiff's Eighth and Fourteenth Amendment claims; **SUSTAINS** Defendants' objections to the PF&R on Plaintiff's Fourth Amendment claim; **OVERRULES** Plaintiff's objections to the PF&R; and **DISMISSES** this matter in its entirety.

*I. BACKGROUND*

A detailed recitation of the factual allegations of this action are set forth in the PF&R, (ECF No. 230), and thus need not be repeated here.   The Court will provide a discussion of any relevant

facts as necessary throughout this opinion to resolve the parties' objections.   Briefly, Plaintiff has asserted claims alleging that the Defendants violated his Fourth, Eighth, and Fourteenth Amendment rights.   (ECF No. 8 at 16, ¶ 2.)   Plaintiff initiated this action in this Court on August 23, 2018.   (ECF No. 1.)   Plaintiff filed his Amended Complaint on October 26, 2018, and only the claims against Web and Simmons remain.[1]   (*See* ECF Nos. 88, 198.)   By Standing Order entered on January 4, 2016, and filed in this matter on August 23, 2018, this action was referred to Magistrate Judge Tinsley for the submission of proposed findings of fact and a recommendation for disposition.   (ECF No. 5.)

Following a period of discovery, Defendants filed the instant motion for summary judgment and accompanying exhibits on August 31, 2020.   (ECF No. 169.)   Plaintiff timely filed his response in opposition on October 21, 2020.[2]   (ECF No. 178.)   Subsequently, Plaintiff obtained an extension of the discovery deadline, and thereafter filed two supplemental responses. (ECF Nos. 222, 224.)   Defendants filed their initial reply on October 28, 2020, (ECF No. 179), and subsequently filed a supplemental reply on May 17, 2021.   (ECF No. 225.)

Magistrate Judge Tinsley submitted his PF&R on August 19, 2021.   (ECF No. 230.)   The PF&R recommends the dismissal of Plaintiff's Eighth and Fourteenth Amendment claims, but also recommends denying summary judgment on Plaintiff's Fourth Amendment claim.   (ECF No. 230 at 35.)   Defendants timely filed their objections to the PF&R on September 1, 2021.   (ECF No.

---

[1] The Court notes that Webb had filed a Counterclaim in this matter, but voluntarily dismissed his claim.   (ECF Nos. 83, 107.)   Plaintiff also attempted to amend his Amended Complaint to add additional claims, but those proposed amendments were denied as "untimely and/or futile."   (ECF No. 230 at 11.)

[2] Magistrate Judge Tinsley noted that Plaintiff's original response was illegible, as his submission was handwritten. (*See* ECF No. 230 at 13.)   Plaintiff thereafter filed a more legible copy of the same brief on October 30, 2020.   (ECF No. 180.)   Should the Court cite anything from Plaintiff's response, it shall be to ECF No. 180.

232.)   Plaintiff, following an extension of time, timely filed his objections on September 20, 2021. (ECF No. 239.)

## II.    LEGAL STANDARD

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).   Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).   The Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed.  *Thomas v. Arn*, 474 U.S. 140, 150 (1985).   Failure to file timely objections constitutes a waiver of de novo review and a party's right to appeal this Court's Order.   28 U.S.C. § 636(b)(1); *see also Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).   In addition, this Court need not conduct a de novo review when a party "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations."  *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

## III.    DISCUSSION

Both Plaintiff and Defendants have filed objections to the PF&R.   Plaintiff's objections to the PF&R are not altogether clear, though he argues that he should be entitled to a "liberal interpretation" of his submissions, "as he is a *pro se* litigant and novice of the law, rules and regulations."[3]   (ECF No. 239 at 1.)     Aside from requesting a liberal construction of his filings,

---

[3] Of course, as a *pro se* litigant, he is afforded a liberal construction of his pleadings, though this standard is not without its limits.  *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) ("[Liberal construction] does

Plaintiff does not direct the Court to any specific errors contained in the PF&R nor does he offer anything of substance that the Court could construe as an objection.   (*See generally* ECF No. 239.) Instead, he maintains that he generally "objects to the proposed finding and recommendation," and that any errors on his part are "solely within the realm of errant comprehension and the inability to properly access the law library and individuals trained to properly litigate matters such as this." (*Id.* at 1, 4.)

Defendants, meanwhile object to the PF&R's recommendation that summary judgment be denied on Plaintiff's Fourth Amendment claim.   In particular, Defendants object to the PF&R's reliance on *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005), to find that there remains genuine issues of material fact that render summary judgment inappropriate.   (ECF No. 232 at 3.) Therefore, based on the objections before it, the Court will begin with Plaintiff's Eight and Fourteenth Amendment claims, before addressing the Fourth Amendment claim and Defendants' objections.

A.    *Plaintiff's Eighth and Fourteenth Amendment Claims*

Plaintiff has not directed the Court to any specific finding in the PF&R to which he objects as it related to his Eighth and Fourteenth Amendment claims.   Defendants similarly have made no objections to the findings of the PF&R addressing these claims.   Therefore, the Court **ADOPTS** the findings of the PF&R, (ECF No. 230), as to Plaintiff's Eighth and Fourteenth Amendment claims; **GRANTS** Defendants' motion for summary judgment, (ECF No. 169), as to these two claims; and **DISMISSES** Plaintiff's claims.

---

not require those courts to conjure up questions never squarely presented to them.").

B.       *Plaintiff's Fourth Amendment Claim*

The PF&R recommends the denial of summary judgment on Plaintiff's Fourth Amendment claim, relying on *Waterman* for the principle that it is clearly established in the Fourth Circuit that it is unreasonable for police officers to use deadly force against a suspect when there is no immediate threat to themselves or the general public.   (ECF No. 230 at 30.)   Because this right is clearly established, the PF&R recommends that this Court find that Defendants are not entitled to qualified immunity.   (*Id.* at 32.)

Defendants, however, argue that *Waterman* is "highly distinguishable" from the facts of this matter.   (ECF No. 232 at 3.)   Unlike the officers in *Waterman*, Defendants here argue that they were "confronted with a more menacing set of facts and circumstances," including the issuance of a "BOLO[4]" for the suspect by the Ohio State Police for the carjacking of a civilian with an AR-15 assault rifle; indications that the suspect was high on methamphetamines and had participated in an "execution style murder"; the characterization of the suspect as "EXTREMELY DANGEROUS [*sic*]" and "WILL ENGAGE IN A SHOOTOUT [*sic*]"; and the leading of officers on a high-speed and off road chase.   (*Id.* at 4.)   Defendants also argue that, most importantly, Plaintiff here remained a danger to the officers as was reasonably perceived by them when discharging their weapons.   (*Id.*)   Because this matter introduces a distinguishable set of facts than *Waterman*, Defendants insist it has no application here and that they should be entitled to qualified immunity on Plaintiff's claim of excessive force.

Qualified immunity is "an immunity from suit rather than a mere defense to liability."   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S.

---

[4] A "BOLO," as used here, is shorthand for a "Be on the Lookout" alert.   (ECF No. 230 at 2.)

511, 526 (1985)).  *See also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) ("We repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.")  Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Thus, qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'"  *Waterman*, 393 F.3d at 476 (quoting *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992)).

To determine whether a law enforcement officer is entitled to qualified immunity, the Supreme Court of the United States articulated a two-part inquiry.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, the court must ask "whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right."  *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014)  (quoting *Saucier*, 533 U.S. at 201) (internal quotation marks omitted).  The second prong asks "whether the right in question was 'clearly established' at the time of the violation."  *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  "Courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"  *Smith v. Ray*, 781 F.3d 95, 106, n.3 (4th Cir. 2015) (quoting *Pearson*, 555 U.S. at 236).

"A constitutional right is 'clearly established' when 'its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Cooper v.*

*Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). While a clearly established right does not require a case that is factually "on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).   "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Katz*, 533 U.S. at 201).

Plaintiff's claims of excessive force are governed by the Fourth Amendment.   The Fourth Amendment guarantees"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const. Amend. IV.   Thus, the Fourth Amendment does not proscribe all seizures, but only unreasonable ones. *See United States v. Sharpe*, 470 U.S. 675, 682 (1985). *See also Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness.").

In determining whether a law enforcement officer has used excessive force, the court must determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).   "The intent or motivation of the officer is irrelevant; the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396–97).   This determination requires the court to weigh "the nature and quality of the intrusion on the individual's Fourth Amendment

interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. "A reviewing court may not employ 'the 20/20 vision of hindsight' and must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (quoting *Graham*, 490 U.S. at 396–97). *See also Waterman*, 393 F.3d at 477 ("[R]easonableness is determined based on the information possessed by the officer at the moment that force is employed.").

Plaintiff claims that both Defendants used excessive force against him when they discharged their firearms at him while in the Sanderson coal camp area, after leading officers on a high-speed chase. Importantly, the Supreme Court recognizes that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Nevertheless, "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9.

With these principles in mind, the Court now turns to the Fourth Circuit's decision in *Waterman*. There, Waterman was observed by officers in the Baltimore Washington International Airport terminal area traveling at a speed of 51 miles per hour in a 25 miles per hour zone. *Waterman*, 393 F.3d at 473. Law enforcement activated their lights and sirens, and when Waterman refused to pull over, initiated pursuit. *Id.* Waterman approached the Fort McHenry Tunnel Toll Plaza where other officers prepared "stop sticks" in an attempt to stop the car. *Id.* The pursuing officers radioed ahead that Waterman had tried to run them off the road and put out

8

a "use caution" warning when Waterman was observed reaching under the seat.  *Id.*   However, not all officers heard the use-caution warning.  *Id.*   As Waterman approached the plaza, several officers emerged from the concrete islands separating the lanes with their weapons drawn and approached the vehicle from the front and passenger sides, directing Waterman to stop.  *Id.* Waterman slowed the vehicle to approximately 11 miles per hour, but then accelerated, causing the vehicle to "lurch."  *Id.*   While none of the officers were directly in front of the vehicle, they stood only a few feet to the side of the vehicle's path and ranged between 16 feet and 72 feet ahead of the vehicle.  *Id.* at 474–75.   The officers perceived Waterman's acceleration as an "attempt to run them over," and so they fired their weapons at him.  *Id.* at 475.   Waterman's vehicle passed the officers, avoiding them, and came to a stop behind another vehicle.  *Id.*   As the officers approached, they continued shooting at Waterman.  *Id.*   In the approximately six-second period between Waterman accelerating and his vehicle coming to a stop, the officers fired eight shots. *Id.*   When Waterman's vehicle passed through the toll lane, it ran over the stop sticks, and the pursuing officer collided with Waterman's vehicle, bringing it to a final stop.  *Id.*   Waterman was shot five times and died at the scene.  *Id.*

The Fourth Circuit reasoned that, if the officers had time to contemplate whether Waterman's sudden acceleration was an attempt to hit them, they would have considered factors such as Waterman's irrational behavior in leading officers on a "more-than-10-minute" chase; his refusal to stop when approached by officers with weapons drawn; his acceleration in the officers' direction; and the report by the pursuing officer that Waterman had just tried to run him off the road.  *Id.* at 477–78.   They might also have considered that in the almost 30 seconds before reaching the plaza, Waterman had not driven recklessly; there was no visible damage to the

vehicle; that other than his flight from officers, Waterman had not committed any other known crimes prior to the chase; and that he had not accelerated past 15 miles per hour or put any officers directly in his path. *Id.* at 478. Recognizing, however, that officers only had a split second to consider these factors, the Fourth Circuit opined that "if the officers paused for even an instant, they risked losing their last chance to defend themselves." *Id.* Therefore, the court held that reasonable officers could have interpreted Waterman's acceleration as a "show of force" or an attempt to use his vehicle as a weapon, such that the officers were justified in utilizing deadly force. *Id.*

However, the same could not be said for the shots fired after Waterman's vehicle passed the officers. *Id.* at 481–82. The Fourth Circuit again articulated the principle that "the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed." *Id.* at 482. At the time the vehicle had passed them by, the officers should have known that the imminent threat of serious physical harm had abated. *Id.* Therefore, the court held that once the vehicle had passed the officers, the danger to their safety was eliminated, and thus the subsequent shots could not be justified. *Id.* at 482.

The PF&R relies on *Waterman* to recommend that a genuine issue of material fact still exists such that a grant of summary judgment is inappropriate. Defendants, as detailed above, argue that the instant case demonstrates a more "menacing" set of facts that, when perceived in the heat of the moment by the Defendants, entitle them to qualified immunity and thus distinguishes this matter from *Waterman*. This Court agrees.

Critical to this determination are the principles articulated above. A court cannot filter a rapidly-evolving scene through hindsight in rendering its decision, and instead must focus on the

10

reasonable perceptions of an officer on the scene at the time.   *See Graham*, 490 U.S. at 397.   With this in mind, it becomes readily apparent that the officers were faced with a much more threatening set of circumstances.

To begin, the instant case did not initiate with an attempted stop for a simple traffic violation, as did *Waterman*.   Instead, officers in the Charleston Police Department, and elsewhere, were notified on February 25, 2017, with a "BOLO" alert from the Ohio State Police, who disclosed that Plaintiff had "carjacked a vehicle using an AR-15," and also had in his possession a "STOLEN LOADED .22 J-Frame Ruger pistol with a crimson trace laser."   (ECF No. 170 at 24, Ex. B.)   The BOLO also stated that Plaintiff should be considered "ARMED AND DANGEROUS" and that he possessed a "lengthy" criminal history, spanning three states and including weapons charges and resisting arrest.[5]   (*Id.*)   Moreover, the Nobles County Sheriff's Office in Ohio advised that Plaintiff was "EXTREMELY DANGEROUS" and would "ENGAGE IN A SHOOTOUT" with police.   (*Id.*)   Finally, the BOLO alerted law enforcement that Plaintiff was likely to continue fleeing to Florida, where he had previously fled to avoid arrest.   (*Id.*) Rather than a relatively minor traffic violation, officers here were immediately presented with an alert regarding a highly dangerous and armed fugitive.

Around 7:48 p.m., the stolen vehicle—a Ford F-350 pickup truck—was spotted traveling on Interstate 77 by Charleston Police Department Officer Barnette, who radioed for backup and began to follow the truck down the interstate.   (ECF No. 230 at 2.)   Plaintiff exited the interstate at Exit 95, on MacCorkle Avenue, where he pulled into a restaurant parking lot, at which point

---

[5] Officers were also under the impression that Plaintiff had, at some time, committed an "execution style murder." (*See* ECF No. 183 at 20–22.)   During his deposition, Plaintiff admitted that it was his father who had been convicted of the murder, but invoked the Fifth Amendment when asked more about the murder.   (*Id.*)   It is currently unclear how the officers here were made aware of Plaintiff's suspected, albeit mistaken, involvement.

Officers Barnette and McClure attempted to initiate a stop by pulling in behind Plaintiff and activating their lights and sirens.  (*Id.* at 3.)  Instead of complying, Plaintiff fled in the stolen truck, returned to the interstate and headed towards Charleston, beginning a dangerous high-speed pursuit.  (*Id.*)  Plaintiff led police on a high-speed chase, with speeds nearing or exceeding 110 miles per hour.  (*Id.  See also* ECF Nos. 222 at 43, 225 at 8–9, 9–10.)  Plaintiff additionally drove the wrong way down an entrance ramp to the interstate, passed cars illegally in the wrong lane of traffic, and simply refused to yield to the officers' demands to stop.  (ECF No. 230 at 3; ECF No. 183 at 19–20.)  Plaintiff's own stated intent was to not get arrested and be sent to prison.  (ECF No. 183 at 20.)  Plaintiff's reckless flight from police, excessive speeds, and driving in oncoming traffic clearly put officers and the public at great risk.

Plaintiff's flight led officers to an off-road area in Sanderson, an unincorporated community about 20 miles northeast of Charleston.  (ECF No. 230 at 3.)  Plaintiff apparently believed that if he was able to get off the paved road, the pursuing officers would not be able to follow him.  (ECF No. 183 at 23–24.)  Plaintiff exited the main road across a small wooden bridge and onto a trail road that lead into a coal camp.  (ECF No. 230 at 3.)  As the pursuit continued off road, many of the officers turned off their lights and sirens.  (ECF No. 183 at 25–26.)  Plaintiff, apparently in an attempt to lose the officers in pursuit, drove across a creek, and then back into the creek, where his truck stalled momentarily.  (ECF Nos. 170, Exs. D, E; 172, Exs. F, G at 2015.)  With his vehicle disabled in the water, Plaintiff ignored multiple commands to surrender.  (ECF No. 170, Exs. D, E; 172, Exs. F, G at 2021–23.)  Plaintiff was able to restart the truck, at which point he drove out of the creek.  (ECF No. 183 at 23:17–21.)  At that time, he

encountered Webb, who fired three shots through the side window, one of which struck Plaintiff in the hand.   (*Id.* at 23:22–24.)

It is critical to understand what was happening in these moments from the perceptions of the officers.   As previously evidenced, officers were aware of Plaintiff's tendency to resist arrest, knew that he was carrying at least one AR-15 rifle, and knew that he would engage in a shootout with officers. Moreover, Plaintiff had only moments before led officers on an extremely dangerous, high-speed chase on the interstate that involved him swerving in and out of oncoming traffic, driving the wrong way through an entrance ramp, "lock[ing] up [his] brakes up on the interstate," and exceeding speeds of at least 100 miles per hour.   (ECF No. 225 at 8–9.)   Then, he led officers to a coal camp where the chase continued off-road and in an area with spotty radio traffic in the dark of night.   (*See* ECF No. 225 at 9–10.)   In fact, there was much confusion about not only Plaintiff's whereabouts upon entering the coal camp, but also the other officer's locations in the area.   (ECF No. 230 at 4.)

Webb admitted in statements to investigators that he thought Plaintiff was on foot when the truck was in the creek, but then saw the vehicle accelerate out of the water.   (ECF No. 170–1 at 5–6.)   Webb also believed that other officers were nearby, and specifically "in the direction in which Plaintiff was headed."   (*Id.* at 44–45.)   This information, coupled with the reckless chase Plaintiff led officers on, as well as the information in the BOLO, led Webb to believe that Plaintiff was an imminent threat to officers and to the public.   (*Id.*)   Plaintiff himself admits that he did not give up.[6]   (ECF No. 35 at 12–14.)

---

[6] Through his supplemental filings, Plaintiff now contends that he was exiting the creek to surrender.   (*See* ECF No. 230 at 5, n.5.)   The PF&R correctly identifies this as a "sham affidavit," as it totally contradicts the evidentiary record before the Court, including Plaintiff's own sworn testimony.   This sham affidavit, filed solely in an attempt to create a dispute of fact, is properly disregarded.   *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("a

Plaintiff did not stop after Webb shot at him. Mere seconds later, Plaintiff encountered Officers Hawley and Smith, both of whom had to act quickly to get out of Plaintiff's path. (ECF No. 172, Ex. K at 2026.) Officer Hawley spun out of the way of the stolen vehicle and fired one shot, which did not hit Plaintiff. Officer Smith, meanwhile, had been attempting to move her police cruiser out of the road, but Plaintiff rammed her cruiser off the road at a speed of 35 miles per hour, totaling the cruiser and injuring Officer Smith. (ECF No. 170–1 at 15–16.) Plaintiff still did not stop, and he continued his flight. (*Id.*) Again, Plaintiff himself admits that he did not yield to the officers' authority. (ECF No. 183 at 25.)

Plaintiff then, only a moment later, encountered Simmons. Simmons had been waiting by the wooden bridge which led out of the camp and back onto the main road. (ECF No. 170 at 30.) Simmons reported that he was "behind [his] end block waiting because shots had already been fired," Plaintiff was a murder suspect out of Ohio, and Plaintiff had just led officers on a "long police pursuit." (*Id.*) Simmons reported hearing several gunshots just before Plaintiff approached, and when Plaintiff came "over the hill," he was driving directly at Simmons at a high rate of speed. (*Id.*; ECF No. 225 at 9–10.) Simmons fired five shots at Plaintiff as he approached, none of which actually hit Plaintiff. (*See* ECF No. 230 at 8.) Plaintiff passed Simmons, and then lost control of the vehicle. (ECF No. 172, Ex. L at 36:42–50.)

Plaintiff was restrained and removed from the truck, and no further force was used against him. (ECF No. 183 at 29.) Officers then found an AR-15 rifle in the truck. (*Id.*) About an

---

party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement"); *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

hour later, emergency personnel arrived and took Plaintiff to the hospital.   (*Id.*)   Plaintiff can be heard on body camera footage apologizing and admitting that he fled from law enforcement because he did not want to go to jail.   (ECF No. 172, Ex. L at 52:50.)

This recitation of facts is critical to the analysis herein because the focus is on "what the police officer reasonably perceived at the time that he acted and whether a reasonable officer armed with the same information, would have had the same perception and have acted in like fashion." *Lee v. City of Richmond*, 100 F. Supp.3d 528, 541 (E.D. Va. 2015) (citing *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994)).   This analysis requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."   *Graham v. Connor*, 490 U.S. 386, 396, 399 (1989).

Unlike *Waterman*, the case presently before the Court does not have a moment where the threat to the officers or the public immediately ceased.   Recall that in *Waterman*, the window in which officers could reasonably utilize deadly force shut as soon as the officers were out of harm's way and the vehicle passed them.   *Waterman v. Batton*, 393 F.3d 471, 481–82 (4th Cir. 2005). Here, however, when the facts are considered "in full context, with an eye toward the proportionality of the force in light of all the circumstances," *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015), it is apparent that the force utilized by Defendants was reasonable.   The officers were faced with an individual they knew to be armed, would engage in a shootout, and who had refused to yield to authority at every step of his flight while putting the officers and the public in danger through his desperate attempts to escape.   At every moment during the pursuit through the coal

15

camp, Plaintiff put officers in danger.   This is perhaps the most important distinction between this case and *Waterman*: In the confines of the Sanderson coal camp, where visibility and radio traffic were "spotty," the officers were never fully aware of either Plaintiff's position nor the precise locations of their fellow officers.   While the officers knew that their fellow officers were nearby, they did not know exactly where but understood that Plaintiff was heading in their direction. (ECF No. 170–1 at 44–45.)   Given Plaintiff's action up until this point, as well as the information police had from the BOLO, in the heat of this dangerous pursuit, officers knew Plaintiff represented a serious and imminent threat to their safety.   As Officer Webb testified, he knew that his fellow officers were up the road: "Their vehicles were in the roadway, . . . and they were definitely in danger of serious injury and/or death because of your actions.[7]"   (ECF No. 225 at 8–9.)   This is in sharp contrast to *Waterman*, where the imminent threat of harm to the officers abated the moment the vehicle passed them.   Indeed, Plaintiff himself attested numerous times that he would stop at nothing to evade the officers because he did not want to go to prison.   (ECF No. 183 at 19–20.)

As the Supreme Court reasoned, a reviewing court cannot sit in the comfort of chambers and contemplate the reasonableness of force utilized by law enforcement with the benefit of "20/20 vision of hindsight."   *Graham*, 490 U.S. at 396.   The Fourth Circuit expounded on the reasonableness of deadly force, as follows:

> [T]he Fourth Amendment does not require omniscience.   Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others.   Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause harm—the Constitution does not require that certitude precede the act of self-protection.

---

[7] Of course, these fears proved true, as only seconds later, Plaintiff rammed the stolen truck into Officer Smith's cruiser, totaling the vehicle and injuring Officer Smith.   (ECF No. 170–1 at 15–16.)

*Elliott, et al. v. Leavitt, et al.*, 99 F.3d 640, 644 (4th Cir. 1996).   The officers possessed sound reason here.

Therefore, for the foregoing reasons, the Court **SUSTAINS** Defendants' objections to the PF&R and **FINDS** that Defendants are entitled to judgment as a matter of law.[8]   Defendants are entitled to qualified immunity, such that Plaintiff's claims against them must be, and hereby are, **DISMISSED**.

### IV.     CONCLUSION

The Court **ADOPTS IN PART** the PF&R, (ECF No. 230), as detailed above, and further **SUSTAINS** Defendants' objections.   (ECF No. 232.)   Plaintiff's objections, (ECF No. 239), are **OVERRULED**.   Further, the Court **GRANTS** Defendants' Motion for Summary Judgment, (ECF No. 169), and **FINDS** that Defendants are entitled to qualified immunity.   Based on the foregoing, this action is **DISMISSED** in its entirety.   The Clerk is further **DIRECTED** to remove this case from the Court's active docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:          September 28, 2021

---

[8] Defendants have also objected to the PF&R's finding that a seizure occurred after Plaintiff lost control of the stolen vehicle and crashed, following the shots fired by Simmons.   (*See* ECF No. 232 at 11–12.)   However, as the Court's findings above establish that both Simmons and Webb are entitled to qualified immunity, resulting in the dismissal of Plaintiff's complaint, the Court shall not entertain this argument.

17

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

18